# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMAX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-4207-JPG |
| | ) | |
| CITY OF BRIDGEPORT, an Illinois | ) | |
| Municipal Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on Defendants' Motion to Dismiss Pursuant to Section 12(b)(6) of The Federal Rules of Civil Procedure (Doc. 6). Defendants submitted a brief in support of this motion (Doc. 7), to which Plaintiff JAMAX Corporation ("Jamax") has responded (Doc. 13). For the following reasons, this motion will be **DENIED in part and GRANTED in part.**

## BACKGROUND

Jamax originally filed its complaint in the Circuit Court of the Second Judicial Circuit, Lawrence County, Illinois on November 4, 2005, alleging an ordinance passed by the City of Bridgeport ("Bridgeport") violated the Commerce Clause and the Equal Protection and Due Process Clauses of the Fourteenth Amendment (Doc. 2).[1] Defendants timely removed the action on November 14, 2005 (Doc. 1) invoking this Court's federal question jurisdiction. 28 U.S.C. § 1331.

---

[1]Jamax named Bridgeport, Max Schauf ("Schauf"), Trent Masterson ("Masterson"), Jo Bell ("Bell"), Lawrence Gognat ("Gognat"), George Zellars ("Zellars") and Otis Hammel ("Hammel") as defendants in this action. Schauf is the mayor of Bridgeport, Masterson is the Chief of Police and Bell, Gognat, Zellars and Hammel are members of the Bridgeport City Counsel ("Counsel").

As this matter comes before this Court on a motion to dismiss, the Court must accept all well-pleaded allegations in Jamax's complaint as true. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005).  Jamax is an Indiana corporation in the waste management business that has refuse removal contracts with residents and businesses in the City of Bridgeport ("Bridgeport").  It filed this suit after Bridgeport passed certain ordinances restricting the waste management business in the City.  The Counsel adopted Ordinance No. 558, titled "An Ordinance Regarding Garbage Collector License" ("558") (Doc. 2 ex. F) on August 12, 2005.[2]  Among other things, this ordinance restricted the hours during which garbage could be collected, mandated that only single-axle trucks weighing less than 25,000 pounds (empty) could collect garbage in the city, and required all those wishing to provide garbage collection services in the City to be licensed.[3]  The stated reason for passing the ordinance was to protect Bridgeport's streets. (Doc. 2 at 7).[4]  On August 24, 2005, the Counsel passed a second ordinance relevant here, No. 559, titled "An Ordinance Pertaining to the Municipal Collection and Hauling of Garbage, Refuse, and Ashes Within the City of Bridgeport, Illinois." ("559") (Doc. 2 ex. A).  This ordinance established a municipal garbage collection and disposal

---

[2]The Counsel passed 558 by a 4-2 vote, with Council Members Bell, Gognat, Zellars and Hammel voting in favor of the ordinance, and Members Wirth and McClellan voting against it. (Doc. 2 at ¶ 4).

[3] No. 558 requires collectors to pick up trash between 7:15 a.m. and 2:30 a.m.  (Doc. 2 Ex. F  §§ 16-1-4, 16-1-5).  Section 16-1-5 forbids garbage trucks operating in the City from having more than one axle or weighing more than 25,000 pounds empty and 34,000 pounds fully loaded.  (*Id*.).  No. 558 also sets out penalties for violations of its provisions, a $250.00 fine for the first offense, a $500.00 fine for a second offense and for third and subsequent offenses $750.00.  (*Id*. at § 16-1-14).

[4] During a special meeting of the Council, a representative for Waste Management – another out-of-state garbage collection service – informed the council that "if they can't use dual-axle trucks, they could not do commercial pick-up in town."  (Doc. 2 at 5).

service for Bridgeport residents and businesses.

After the passage of these ordinances, Bridgeport established its own garbage collection and disposal service and purchased a single-axle garbage truck weighing less than 25,000 pounds. Bridgeport began its garbage collection business in August or September 2005. It attempted to force its citizens to pay for its new garbage service by adding fees to their water bills; it made no distinction between those residents with existing contracts with private garbage collectors and those without. (Doc. 2 at 3). Several Bridgeport residents complained to the Counsel of being billed for services they were not using, and, in response, Schauf stated publicaly that those residents "would not be charged for the city trash service until their contract expired." (*Id*. at 3). In earlier Counsel meetings where Schauf was speaking of the City's plans regarding its trash service, he told residents that Bridgeport would not issue any more trash permits to private haulers in 2006. (*Id*.).

Jamax claims that these ordinances have damaged its business because it has had and continues to have a number of refuse collection contracts with Bridgeport residents and businesses. As Jamax only has multi-axle trucks weighing more than 25,000 pounds and needs the freedom to operate beyond the hours set by the City, these ordinances make it impossible for it to do business in Bridgeport. Since the adoption of these ordinances Schauf and Masterson have repeatedly delayed and hindered Jamax's business operations by directing City police to divert and impound Jamax trucks and drivers while servicing customers along Jamax's normal routes – despite the fact that 558 does not provide for the impoundment or diversion of trucks as enforcement mechanisms. ((Doc. 2 Ex. F at § 16-1-14). As a result of these activities, many Jamax customers have cancelled their contracts. Bridgeport revoked Jamax's garbage collection license without a hearing on October 19, 2005.

<u>**ANALYSIS**</u>

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Budz*, 398 F.3d at 908; *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). The Court should not grant such a motion unless it appears beyond doubt that the plaintiff cannot prove its claim under any set of facts consistent with the complaint. *Brown*, 398 F.3d at 908-09; *Holman*, 211 F.3d at 405. "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted). The complaint need only provide a short and plain statement of the claim sufficient to fairly put the defendant on notice of the claim and its basis. *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Brown*, 398 F.3d at 908; *see also* Fed. R. Civ. P. 8(a).

## A.      Standing

Defendants claim Jamax does not have standing to bring this action because it is an unregistered foreign corporation that conducts intrastate business in Illinois. *See* 805 ILCS § 5/13.70. Section 5/13.70(a) states that "[n]o foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority." 805 ILCS § 5/13.70(a). Defendants request the Court to take judicial notice that Jamax is not registered to business in Illinois with the Illinois Secretary of State. They maintain that because Jamax's suit arises solely from its *intrastate* transactions, it is without the capacity to maintain this suit. In its response, Jamax claims Defendants have failed to meet their burden of establishing that Jamax is transacting business in Illinois in violation of the Business

-4-

Corporation Act.

Under Illinois law, a foreign corporation is not required to obtain a certificate of authority if it is "simply conducting interstate commerce[,]" *Subway Rests., Inc. v. Riggs*, 696 N.E.2d 733, 737 (Ill. App. Ct. 1 Dist. 1998), and a defendant bears the burden of establishing that the plaintiff is conducting business in violation of the Business Corporation Act. *Id.*; *Mass Transfer Inc. v. Vincent Const. Co.*, 585 N.E.2d 1286, 1289 (Ill. App. Ct. 5th Dist. 1992). In its complaint, Jamax alleges that it is an Indiana corporation that does business in Illinois and it plainly asserts that it conducts an interstate business (Doc. 2 at ¶¶ 1, 97, 98, 99, 100, and 101). As the cases cited by Jamax show, whether a particular business is registered to do business in the state is not dispositive of the standing issue under 805 ILCS § 5/13.70(a). *Riggs*, 696 N.E.2d at 737; *Mass Transfer Inc.*, 585 N.E.2d at 1289. Thus, Defendants' conclusory allegation that "plaintiff's lawsuit relates solely to plaintiff's intrastate transactions" is insufficient to meet their burden. Neither side has adequately detailed how courts have interpreted the phrase "simply conducting interstate commerce" for purposes of 805 ILCS § 5/13.70(a). Without more detailed information as to how that standard has been applied and the precise nature of Jamax's business, the Court is without sufficient information to decide the standing issue. Defendants have failed to persuade the Court that Jamax cannot bring this suit because of 805 ILCS § 5/13.70(a).

**B.      Commerce Clause Claims**

Art. I, § 8, cl. 3, of the Constitution gives Congress the power to "regulate Commerce with foreign Nations, and among the several States, and the Indian Tribes." U.S. Const. Art. 1, § 8, cl. 3. Though an affirmative grant of power, it "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce."

*S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).  This self-executing limitation, which is animated by the potential for the "economic Balkanization" of the States, is the so-called dormant Commerce Clause.  *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979).  The Supreme Court has set forth a two-tiered approach to analyzing state regulations implicating the doctrine.  *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 657 (7th Cir. 1995).  "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court generally has struck down the statute without further inquiry," subject to an exception not relevant here.  *Id*. (internal quotations and citations omitted); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).  When a statute is facially neutral and has only indirect or incidental effects on interstate commerce, the Court undertakes what has been termed the *Pike* balancing test.  *Meyer*, 63 F.3d at 657; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").  Under *Pike*, a court must uphold the statute "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Meyer*, 63 F.3d at 657 (quoting *Pike*, 397 U.S. at 142).  The *per se* invalidity discussed in *Meyer* applies equally to those statutes that are discriminatory in effect.  *Id*. at 658.  If a purportedly evenhanded statute discriminates against interstate commerce in practical effect, it is subjected to the same scrutiny as if it were facially discriminatory.  *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1278 (7th Cir. 1992).  Thus, courts must look beyond the stated purpose of a statute and examine its practical effect.  *Id*. (citing *Hughes*, 441 U.S. at 336).

As a threshold matter, the Court must determine whether the ordinance regulates interstate commerce. As a general proposition, the Commerce Clause applies to regulations on the collection of solid waste. *Meyer*, 63 F.3d at 657. On the facts of this case, *C & A Carbone, Inc. v. Town of Clarkstown*, is instructive. There, the Supreme Court found that an ordinance requiring solid waste produced in Clarkstown to be processed at a specific waste transfer site in town before going elsewhere implicated the Commerce Clause. 511 U.S. at 389. Even though the immediate effect of the ordinance was to direct local waste to a specific site within the municipality, the Court held that it affected interstate commerce, emphasizing the facts that the ordinance increased the costs for disposing of waste to out-of-state businesses and deprived them of access to the local market. *Id.* ("These economic effects are more than enough to bring the Clarkstown ordinance within the purview of the Commerce Clause."). Jamax has alleged that the axle and weight restrictions keep at least two out-of-state businesses, itself and Waste Management, from doing business in Bridgeport.[5] (Doc. 2 at 5). In any event, Jamax alleges that these restrictions increase costs to out-of-state waste management companies to such an extent that they are excluded from the market. (Doc. 2 at 10). These allegations are sufficient to show that 558 implicates the Commerce Clause.

Initially, the plaintiff bears the burden of demonstrating that an ordinance is unduly burdensome or discriminatory. *Hughes*, 441 U.S. at 336; *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 353 (1977). If this showing is made, the burden shifts to the government entity to establish that the ordinance serves a legitimate local purpose and that nondiscriminatory alternatives are unavailable. *Hughes*, 441 U.S. at 336; *Hunt*, 432 U.S. at 353. In their motion, Defendants claim 558 is a facially neutral regulation, which does not burden interstate commerce.

---

[5] It is not clear if all out-of-state haulers are similar in this regard.

They claim it was enacted for a plainly legitimate purpose, the protection of the City's streets, and more importantly, that Bridgeport may deny out-of-state businesses access to its garbage market without violating the Commerce Clause. *See, e.g., USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir. 1995); *Southern Waste Sys. v. City of Delray Beach*, 420 F.3d 1288 (11th Cir. 2005); *Bennett Elec. Co. v. Village of Miami Shores*, 11 F.2d 1348, 1352 (S.D. Fla. 1998); *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 257 (2d Cir. 2001). Defendants also claim the decision to take over trash collection duties is expressly authorized by Illinois law, 65 ILCS § 5/11-19-5; *Montgomery v. City of Galva*, 244 N.E.2d 193, 195 (Ill. 1969), and that Jamax cannot state a claim for a Commerce Clause violation under 42 U.S.C. § 1983. *Gould, Inc. v. Wisconsin Dep't of Indus. Labor & Human Relations*, 750 F.2d 608, 616 (7th Cir. 1983). The Court need not give any attention to Defendants' last claim because this argument was specifically rejected by the Supreme Court in *Dennis v. Higgins*, 498 U.S. 439, 451 (1991).

Though the Court must entertain a presumption in favor of the ordinance's validity, Jamax's allegations that 558 is discriminatory in effect and that its burdens on interstate commerce are clearly excessive in relation to its putative benefits are sufficient to defeat it. Under the Seventh Circuit's decisions in *Brown, Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) and *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002), interpreting the Supreme Court's decision in *Leatherman*, these allegations are likely sufficient, in themselves, to get past Defendants' motion. A Rule 12(b)(6) motion to dismiss is not the best place for a court to conduct fact-sensitive balancing tests. In any event, Jamax's allegations are sufficient to shift the burden to Defendants to establish that the ordinance serves a legitimate purpose, that no nondiscriminatory means were available, and that its burdens on commerce do not clearly exceed its benefits. Defendants must

convince the Court that there is no set of facts that could be proven consistent with the complaint which would entitle Jamax to a judgment in its favor. *Brown*, 398 F.3d at 908-09.

Jamax has alleged that the purpose and effect of the ordinance is to discriminate against out-of-state businesses. More importantly, it claims the ordinance does not benefit the City in any meaningful way because its restrictions do not apply to any other type of truck. Given the lens through which the Court must view the complaint, this is an extremely important point because the putative local benefits of a regulation are important in *Pike* balancing. The Court has no information regarding the weight of Jamax's and other out-of-state haulers' trucks, so it can make no determination as to the relative benefits of restricting the weight of these vehicles to less than 25,000 pounds. Further, the Court lacks sufficient information to determine what percentage of the truck traffic in the City is attributable to garbage trucks. If the Court accepts Jamax's allegations as true, which it must, then the ordinance keeps out-of-state businesses from operating within the city. Given this allegation and the allegations regarding the benefits of the ordinance, the Court cannot say as a matter of law that the burdens imposed by the ordinance are not clearly excessive in relation to its benefits. *See Pike*, 397 U.S. at 145 (finding Arizona's "tenuous interest in having the company's cantaloupes identified as originating in Arizona [could not] constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the State").

An important argument raised by the Defendants is that the greater power of a municipality to take on all refuse collection responsibilities itself includes the lesser power to regulate the industry in a way that discriminates and imposes burdens on out-of-state businesses. The main cases offered in support of this proposition are *USA Recycling, Inc. v. Town of Babylon* and *Southern Waste Sys. v. City of Delray Beach*, cases out of the Second and Eleventh Circuits, respectively.

Defendants' greater-includes-the-lesser argument may be correct but the cases they cite do not support it. Defendants' reading of *USA Recycling* and *Delray Beach* is much too broad. Defendants believe these cases hold that a municipality has an unrestricted right to ouster all out-of-state trash businesses and dispose of its residents' trash itself without violating the Commerce Clause. This may indeed be true under the so-called market participant exception. However, these cases do not turn on that exception and Defendants failed to mention it by name anywhere in their brief. These cases certainly do not hold that a city can award a trash collection contract to one business without restriction. This proposition was rejected in *Carbone*. In *Carbone*, the Supreme Court struck down as impermissibly discriminatory, a flow control ordinance requiring all solid waste produced in the city to be processed at a processing facility in the city. 511 U.S. at 389, 392 (finding that the ordinance was not saved by the fact that it burdened both in-state and out-of-state businesses equally). The Court held that the ordinance violated the Commerce Clause because it was designed to, and had the effect of, hoarding solid waste, and the demand to get rid of it, "for the benefit of the preferred processing facility." *Id*. The Court held that this was the type of ordinance which it had classified as *per se* invalid. The Court found that the city did not fall into the narrow exception it has recognized to the *per se* invalidity rule because the City failed to demonstrate (under rigorous scrutiny) that the action taken was the only way to achieve the desired end. *Id*.

In *USA Recycling, Inc. v. Town of Babylon*, the Second Circuit Court of Appeals was presented with a factual situation similar to, though importantly different from, the case at bar. There, as a result of its waste management problems, Babylon chose to take over the local commercial garbage market and to license only one company to collect its commercial refuse – it excluded all other waste management firms, both in-state and out-of-state. *USA Recycling, Inc.*, 66

-10-

F.3d at 1275, 1278-79.  Various waste management companies brought suit in federal court seeking to prevent Babylon from implementing its contract with its chosen provider.  *Id.* at 1279.  The Court rejected plaintiffs' contention that the contract was functionally the same as the ordinance in *Carbone*.  *Id*. at 1283.  The plan was not discriminatory as in *Carbone* because the contract eliminated the commercial refuse market in the town.  *Id*.  Babylon charged the owner of every improved parcel of commercial property a $1,500.00 annual benefit assessment to pay for garbage collection, thus, there was no charge for commercial pick up; it was paid for through the yearly assessment.  *Id*. at 1279.  As the Court explained, businesses in Babylon did

> not buy services from anyone.  Instead, the Town unilaterally provide[d] garbage service to everyone in the District.  Although taxpayers in the District ultimately foot the bill for these garbage services – just as they foot the bill for street sweeping, street lighting . . . the payment of taxes in return for municipal services is not comparable to a forced business transaction . . . .

*Id*. at 1283.  The competitive bidding process used by Babylon (through which it accepted bids from both in-state and out-of-state firms) was also quite important to the court's decision.  *Id*. at 1279.  As the town used this competitive bidding to select the business, it gave all providers, in-state and out-of-state, an equal opportunity to compete for the contract and therefore treated all haulers the same.  *Id*. at 1285.  Thus, the city's implementation of the contract was not facially discriminatory.  *Id*.  The plan also survived *Pike* balancing for similar reasons.  The burdens on interstate commerce were incidental at best because the plan essentially put all the garbage contracts in the hands of one buyer, the City, who could just as easily have hired an out-of-state hauler as one from within the state.  *Id*. at 1287.  The court also found that Babylon had a compelling interest in its waste management program. Thus, the Court upheld Babylon's plan under both *Carbone* and *Pike*. *Id*. at 1295.

*Delray Beach* and other cases interpreting *USA Recycling* do not support Defendants' broad reading. In *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 188-89 (1st Cir. 1999), the First Circuit held that an ordinance which funneled all residential waste through a single contractor did not violate the Commerce Clause for reasons similar to those in *USA Recycling*. Key to the court's decision to uphold the ordinance, was the fact that Houlton entertained competitive bids from both in-state and out-of-state businesses before awarding the contract to service its residents' garbage collection needs. *Id.* Similarly, in *Nat'l Solid Wastes Mgmt. Ass'n. v. Daviess County, Ky.*, 434 F.3d 898, 908 (6th Cir. 2006), the Court recognized that the complete elimination of a local market and competitive bidding can insulate an ordinance against Commerce Clause attack. Importantly, however, the Court rejected comparisons to *USA Recycling* because there was no market elimination and no competitive bidding. *Id.* at 909. Had the county charged nothing for the disposal of waste and passed the cost to its residents via taxes, the Court would have been inclined to accept the comparison, but the fact that fees were still charged forced its rejection. *Id.* The same was true in *Southern Waste Sys., LLC. v. City of Delray Beach*. In that case, Delray Beach awarded a contract to a single out-of-state firm to collect all the city's garbage for a term of 5 years. *Delray Beach*, 420 F.3d at 1289. The Court rejected a dormant Commerce Clause challenge to the contract. As in *USA Recycling*, the Court focused on the process used to award the contract. It placed great emphasis on the fact that Delray Beach entertained competitive bids and eventually chose an *out-of-state* firm to service its waste management needs. *Id.* at 1291. As the other courts of appeals, the Eleventh Circuit refused to read *Carbone* for the proposition that allowing one entity to collect a town's garbage necessarily violated the Commerce Clause. However, like the First and Sixth Circuits, the Eleventh Circuit did not adopt the assertion urged upon the Court by Defendants

here.

The present case is meaningfully distinguishable from *USA Recycling*.  First, 558 did not itself eliminate the garbage market in town; it put restrictions on the time and manner of service. Important to the holding in *Babylon*, was the court's determination that "the payment of taxes in return for municipal services is not comparable to a forced business transaction" required in *Carbone*." *USA Recycling*, 66 F.3d at 1283. Whether this is a practical and meaningful distinction, the Court need not decide, because Jamax has alleged that the effect of 558 is to drive out-of-state businesses out of the City, thereby *forcing* its residents to turn to the City for garbage services. Thus, they have alleged the sort of discrimination held to violate the Commerce Clause in *Carbone*. Further, 558 does not eliminate the market for garbage collection services, for it contains a provision requiring private businesses to obtain a license to collect trash.  According to the complaint, Bridgeport is not paying for garbage collection services with taxes; it adds the charges to its residents' water bills.  If the Court were to accept Defendants' contention that the ordinance grants Bridgeport the exclusive right to collect garbage, which it clearly does not, it would still not eliminate the market; it would make it a market of one.  For these reasons, Defendants have failed to show that the Commerce Clause claims must be dismissed.  Therefore, in this respect, their motion to dismiss is **DENIED**.

### C.    Equal Protection Clause Claims

Jamax claims 558 violates the Equal Protection Clause of the Fourteenth Amendment.  It claims the weight and axle restrictions on garbage trucks are arbitrary, capricious and unreasonable – to the extent they were actually imposed to protect the City' residential streets – because the City regulates no other type of truck.  Jamax takes issue with the City's stated reason for passing the

ordinance because it was not included in the text of 558, and with the fact that Defendants have presented no facts establishing that garbage trucks travel through the City more frequently than other trucks do.  In their response, Defendants claim legislating for the protection of the City's streets is a legitimate state interest, and that starting with garbage haulers is a reasonable first step toward that legitimate end.  Defendants cite a number of cases where courts have upheld similar first-step measures drawing similar classifications.  *See, e.g., Vaden v. Village of Maywood*, 809 F.2d 361, 365 (7th Cir. 1987).

The parties agree that 558 does not draw a suspect classification or implicate a fundamental right.  Thus, this Court must uphold the ordinance if the classification drawn "is rationally related to a legitimate state interest."  *Vaden*, 809 F.2d at 365.  Importantly, this claim is before the Court on a Rule 12(b)(6) motion. As such, the complaint need only give Defendants fair notice of the claims and the grounds upon which they rest.  *Swierkiewicz v. Sorema N.A.*, 534 U.S.  512 (2002).  Under this standard, the Seventh Circuit has held an individual can state a claim for an Equal Protection violation sufficient to get past a Rule 12(b)(6) motion by simply alleging, "I was turned down for a job because of my race."  *Bennett*, 153 F.3d at 518; *see also Brown*, 398 F.3d at 916-17 & 916 n.1.  Given the standard enunciated in *Bennett*, the Court finds that Jamax's allegations that the ordinance "is not reasonably related to [Bridgeport's stated goal of protecting its streets from damage because it]  exempt[s] all other businesses from its regulation" and that "its classifications are unreasonable and improper" give Defendants fair notice of the claims and their bases.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976) (noting that an economic regulation may be struck down under the Equal Protection Clause if the classification is "wholly arbitrary").  Though a plaintiff faces a decidedly uphill battle when attacking an economic regulation that does not

implicate a fundamental right, as such a regulation can be struck down if wholly arbitrary, the allegations in the complaint are sufficient on their face.  However, this is not the end of the inquiry.

Even if a complaint gives a defendant notice of the claim, dismissal may still be proper under Rule 12(b)(6) if the complaint includes allegations of facts showing that the plaintiff is not entitled to relief.  *Bennett*, 153 F.3d at 519.   Here, Jamax alleges that Bridgeport passed the ordinance for the stated purpose of protecting its streets from damage.  (Doc. 2 at ¶¶ 101, 150).  Though it does not dispute that this would be a valid purpose, it claims Defendants offered it as a dodge to hide the real purpose, discriminating against out-of-state businesses.

When regulating in this area, municipalities "are accorded wide latitude" and may make rational distinctions "with substantially less than mathematical exactitude." *Vaden*, 809 F.2d at 365.  In evaluating the decisions of legislative bodies, courts generally defer to legislative policy decisions and are rightfully averse to sitting as superlegislatures. *Dukes*, 427 U.S. at 303.  It is not the place of the courts to second-guess or judge the wisdom of a particular policy determination; in these situations, courts should defer to "legislative determinations as to the desirability of particular statutory discriminations."  *Id*.  The Supreme Court has said, "Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them."  *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808 (1969); *see also Railway Express Agency v. New York*, 336 U.S. 106, 110 (1949); *Kotch v. Bd. of River Port Pilot Comm'rs*, 330 U.S. 552, 562 (1947).  Though these cases applying this "conceivable basis" approach are not recent, the Seventh Circuit applied the standard in *Johnson v. Daley*, a case decided in 2003. 339 F.3d 582, 586 (7th Cir. 2003).  There, the Court reiterated the

notion that a legislative decision "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* (citation omitted).  It held that legislation passes the equal-protection requirement "if the legislature could think the rule rationally related to any legitimate goal of government."  *Id.* at 585.  As Defendants have proffered an admittedly legitimate purpose (whether this was their actual purpose is disputed, but irrelevant), the Court cannot look behind it so long as the discrimination accomplished by the classification is rationally related to that end.  *See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,' *Flemming v. Nestor*, [363 U.S. 603, 612 (1960)], because this Court has never insisted that a legislative body articulate its reasons for enacting a statute.").

Jamax's arguments attacking the appropriateness and reasonableness of singling out garbage trucks are insufficient to defeat Defendants' motion on these claims.  Given the discretion afforded legislatures under the mere rationality test, the Equal Protection Clause does not prevent them from instituting reforms "one step at a time, addressing [themselves] to the phase of the problem which seems most acute to the legislative mind." *Johnson*, 339 F.3d at 586 (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)).  Stated otherwise, a state may adopt a regulation "that only partially ameliorate[s] a perceived evil" and may permissibly defer "complete elimination of the evil to future regulations."  *Dukes*, 427 U.S. at 303.  A few examples serve to illustrate the point.  In *Vaden*, the Village of Maywood placed certain restrictions on mobile food vendors – prohibiting their operation of mobile food vehicles in town between 8:00 a.m. and 4:00 p.m. – to, among other things, prevent children from being delayed going to or coming from school.

-16-

*Vaden*, 809 F.2d at 363-64.  Vaden operated a mobile food vending business primarily catering to schoolchildren, and as such, the ordinance effectively eliminated her customer base during the school year.  *Id*. at 363.  The Court rejected Vaden's claim that the ordinance was arbitrary and irrational.  *Id*. at 365.  Noting that the classification reflected the town's determination that because vendors such as Vaden could travel, they were more likely to delay children, the Court found that Maywood was "entitled to focus on those vendors that it perceived as causing the most serious problem."  *Id*. at 366.

The decision in *Vaden* is not unique.  In *Williamson v. Lee Optical Co.*, the Supreme Court upheld against an Equal Protection challenge, an Oklahoma statute which exempted sellers of ready-to-wear glasses from complying with a statute mandating that only licensed optometrists or ophthalmologists could perform certain procedures.  348 U.S. at 485, 489.  In upholding the classification, the Court held that a legislature "may select one phase of one field and apply a remedy there, neglecting others."  *Id*. at 489.  Similarly, in *City of New Orleans v. Dukes*, the Supreme Court rejected an Equal Protection challenge to a New Orleans ordinance exempting established pushcart vendors (those operating for 8 or more years) from a general prohibition on selling food from such carts in the French Quarter. 427 U.S. at 298.  It held that New Orleans' step-by-step approach (allowing some vendors to stay and others not) was permissible.  It declined to delve too deeply into New Orleans' stated reasons for the decision, and accepted that preserving the appearance of the French Quarter was a legitimate interest rationally furthered by the ordinance.  *Id*. at 304.  New Orleans' choice to start with the more recent vendors was a rational place to start.  *Id*. at 305.  These cases affirm the ability of a municipality to draw fine distinctions, such as the one drawn by Bridgeport here, with no more justification than the need to start addressing a legitimate

problem somewhere.   It is not the Court's place to question Bridgeport's decision to start with garbage trucks so long as it is conceivable that there is some rational relation between that decision and its admittedly legitimate stated purpose.  In the Court's view, it is certainly reasonable to believe that garbage trucks traverse residential streets more frequently than other trucks.  Even with no evidence to support such a belief, Bridgeport could reasonably have so found.  *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) ("The Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems, merely because another type, already established in the market, is permitted to continue in use. Whether in fact the Act will promote more environmentally desirable milk packaging is not the question: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives.") (emphasis added); *Johnson*, 339 F.3d at 585.  Given the proffered purpose and the Court's unwillingness to find that Bridgeport could not have rationally decided to foster that end by limiting the weight and axles of garbage trucks on its residential streets, the Court cannot label the classification "purely arbitrary." *See Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 77 (1911).  Jamax itself has alleged a conceivable basis for the classification which effectively defeats its claim. *See McDonald*, 394 U.S. at 808; *Johnson,* 339 F.3d at 585-86.  Jamax has cited to no other case suggesting the need for further inquiry.  Therefore, Defendants' motion is **GRANTED** with regard to Jamax's Equal Protection Claims, which are hereby **DISMISSED**.

### D.    Due Process Clause Claims

Jamax puts forth a number of grounds for its due process claim in the complaint.  First, it

-18-

argues that Defendants' enforcement of the ordinance has violated the protections afforded by the clause inasmuch as they have unlawfully seized, diverted and impounded its trucks. Second, Jamax claims the ordinance unlawfully interferes with its existing customer contracts. Finally, Jamax claims Defendants violated its right to procedural due process by revoking its garbage collection license without notice or hearing.   In their motion, Defendants claim Jamax has failed to state a claim for relief because the property rights at issue were not the type necessitating a hearing or notice.  As the statute is not wholly arbitrary, they claim the complaint fails to include allegations to overcome the presumption in favor of the validity of an economic, public welfare regulation.

The first question the Court will address is whether Jamax's license was property protected by the due process clause of the Fourteenth Amendment.  This question depends on state law.  *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983).  For the proposition that this license was not constitutional property, Defendants have offered *Triple A Servs., Inc. v. Rice*, 545 N.E.2d 706 (Ill. 1989).  In that case, the Supreme Court of Illinois was called to decide, among other things, whether an ordinance prohibiting mobile food vendors from conducting their business within the Medical Center District of Chicago violated the vendors' due process rights under the Fourteenth Amendment.  *Id*. at 707.  There, the Court did not find that the vendors' food-dispensing licenses were not property; it simply held that the ordinance did not revoke them.  *Id*. at 713.  Thus, this case does not support Defendants' contention.  The Seventh Circuit has held that a liquor license, a not entirely dissimilar license to conduct business, constitutes property subject to due process protections.  *Club Misty, Inc. v. Laski*, 208 F.3d 615, 618 (7th Cir. 2000); *Reed*, 704 F.2d at 948. In coming to this determination, the Court in *Reed* examined the statute under which such licenses were granted to determine whether the licenses possessed the "the conventional attributes of

property." *Reed*, 704 F.2d at 948.  To make this determination, the Court looked at whether the license was property in a functional sense, property "securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Id*.  Other than their citation to *Triple A*, Defendants do not discuss whether a license issued under 558 possesses any of these attributes.  In fact, it is not clear from the briefs or the complaint whether Jamax's license was issued pursuant to the ordinance or whether it was granted under a previous provision.  Without any further information and arguments by Defendants on this issue, the Court finds that they have failed to meet their burden of demonstrating that Jamax's due process claim, at least with regard to the notice and hearing issue, is without merit. *See Yeksigian v. Nappi*, 900 F.2d 101, 104-05 (7th Cir. 1990).        If the license was property protected under the due process clause, Jamax was entitled to notice and an opportunity to be heard before its revocation.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972).  As such, their motion to dismiss must be **DENIED** on this point.  As there is at least one ground supporting Jamax's due process claim, the Court need not address the alternative grounds Jamax has offered in support of its claim.  In any event, Defendants have completely failed to address Jamax's claims regarding the seizure, diversion and impoundment of its vehicles, the ordinance's effect on its customer contracts and Jamax's claims as to the restriction of its liberty interest in interstate travel.  The Court makes no comment on the relative merits of these alternative grounds except to say that it surely will not reject them entirely without specific arguments from the Defendants.  Defendants' citation to the general law in this area, without regard to the specifics of this case, is patently insufficient.

## <u>CONCLUSION</u>

-20-

Defendants' motion to dismiss (Doc. 6) is **GRANTED in part and DENIED in part** as follows:

1.      Defendants' motion to dismiss is **DENIED** with respect to Jamax's claims under the dormant Commerce Clause.

2.      Defendants' motion to dismiss is **GRANTED** with respect to Jamax's claims under the Equal Protection Clause of the Fourteenth Amendment.  Therefore, Counts III, VII, XI and XV are **DISMISSED**.

3.      Defendants' motion to dismiss is **DENIED** with respect to Jamax's claims under the Due Process Clause of the Fourteenth Amendment.

The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of this case.

**IT IS SO ORDERED.**

**Dated: April 11, 2006.**

 /s/ J. Phil Gilbert
**J. PHIL GILBERT**
**U.S. District Judge**